# 15-2516-cr

To be argued by:
**ALLEGRA GLASHAUSSER**

United States Court of Appeals
For the Second Circuit

Docket No. 15-2516-cr

UNITED STATES OF AMERICA,

Appellee,

-against-

GREGORY JOHN SCHAFFER, a/k/a John Archambeault,

Defendant-Appellant.

APPEAL FROM A JUDGMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLANT GREGORY JOHN SCHAFFER

Federal Defenders of New York, Inc.
Appeals Bureau
52 Duane Street, 10th Floor
New York, New York 10007
Tel. No.: (212) 417-8742

Attorney for Defendant-Appellant
Gregory John Schaffer

ALLEGRA GLASHAUSSER,
Of Counsel

# Table of Contents

Statement of Jurisdiction ...................................................................................1

Questions Presented ...........................................................................................2

Statement of the Case .........................................................................................2

Statement of Facts...............................................................................................3

    Motion to suppress statements taken without *Miranda* ...............................4

    Motion to introduce videotapes of unrelated sexual assaults ....................7

    The Trial ...................................................................................................10

        Opening Statements................................................................10

        Prosecution Case ..................................................................10

        Execution of the search warrant and interrogation .................17

        Evidence from the computer and paramountpics1@aol.com
        email address.........................................................................18

        Summations............................................................................19

        Charge and Sentence.............................................................21

Summary of Argument .....................................................................................22

Argument

    Point I

    Appellant's un-*Mirandized* statement should have been
    suppressed because he was in custody during an
    interrogation when he twice asked to leave and was twice
    told he was not free to do so.....................................................................23

       A.    Standard of review .............................................................24

       B.    *Miranda* warnings are required before custodial
           interrogation.......................................................................24

C.    Appellant was in custody during his hour-long
      interrogation when he was told twice that he
      could not leave to see a lawyer ......................................................27

D.    The failure to suppress appellant's statements was harmful....................30

Point II

Video evidence of appellant apparently sexually assaulting
two young girls, who were completely unconnected to
the current charges, should have been excluded........................................32

A.    Standard of review ......................................................................33

B.    The videos should have been excluded because
      Rule 413 violates due process protections by allowing
      evidence of propensity to commit sexual assaults to
      prove guilt of a specific crime....................................................33

      a.    This Court should reject the conclusion that
            Rule 403 protects against the fundamental fairness
            problem inherent in Rule 413 ..........................................35

      b.    Rule 413 was designed to produce more sexual
            assault convictions based on the fundamentally
            flawed assumption that past commission of sexual
            assault proves guilt of a charged sexual assault.............................38

      c.    Admission of the other sexual assault evidence
            violated appellant's due process rights............................................41

C.    The videos should have been excluded because they were
      more prejudicial than probative ................................................42

D.    These errors were not harmless................................................45

Conclusion  ........................................................................................47

# Table of Authorities

## Cases

*Berkemer v. McCarty*,
  468 U.S. 420 (1984) ............................................................................... 25, 26

*California v. Beheler*,
  463 U.S. 1121 (1983) ............................................................................... 6, 25

*Chapman v. California*,
  386 U.S. 18 (1967) ................................................................................... 30, 45

*Dowling v. United States*,
  493 U.S. 342 (1990) ................................................................................. 34

*Georgison v. Donelli*,
  588 F.3d 145 (2d Cir. 2009) ................................................................... 25

*Graham v. Hoke*,
  946 F.2d 982 (2d Cir. 1991) ................................................................... 30

*Howes v. Fields*,
  132 S. Ct. 1181 (2012) ............................................................................. 6, 25

*In re Winship*,
  397 U.S. 358 (1970) ................................................................................. 34

*Johnson v. Elk Lake Sch. Dist.*,
  283 F.3d 138 (3d Cir. 2002) ................................................................... 38

*Michelson v. United States*,
  335 U.S. 469 (1948) ................................................................................. 34

*Miranda v. Arizona*,
  384 U.S. 436 (1966) ................................................................................. 24

*Morris v. New York,*
  2008 WL 850679 (E.D.N.Y. Mar. 29, 2008) ................................................. 7

*Old Chief v. United States,*
  519 U.S. 172 (1997) ...................................................................... 34

*Oregon v. Mathiason,*
  429 U.S. 492 (1977) ...................................................................... 26

*Orozco v. Tex.,*
  394 U.S. 324 (1969) ...................................................................... 26

*Spencer v. Texas,*
  385 U.S. 554 (1967) ...................................................................... 34

*State v. Cox,*
  781 N.W.2d 757 (Iowa 2010) .............................................................. 35

*State v. Ellison,*
  239 S.W.3d 603 (Mo. 2007) ............................................................... 36

*State v. Gresham,*
  269 P.3d 207 (Wash. 2012) ............................................................... 36

*Thompson v. Keohane,*
  516 U.S. 99 (1995) ....................................................................... 25

*United States v. Abbas,*
  418 F. Supp. 2d 280 (W.D.N.Y. 2006) ............................................... 6, 28

*United States v. Badmus,*
  325 F.3d 133 (2d Cir. 2003) ................................................. 6, 24, 26, 28

*United States v. Carter,*
  489 F.3d 528 (2d Cir. 2007) ............................................................. 24

iv

*United States v. Craighead,*
   539 F.3d 1073 (9th Cir. 2008) ...................................................................... 27

*United States v. Davis,*
   624 F.3d 508 (2d Cir. 2010) .................................................................... 36, 37

*United States v. Donaldson,*
   577 F. App'x 63 (2d Cir. 2014) .................................................................... 36

*United States v. Enjady,*
   134 F.3d 1427 (10th Cir. 1998) .................................................................... 36

*United States v. Fnu Lnu,*
   653 F.3d 144 (2d Cir. 2011) .....................................................6, 24, 25, 26

*United States v. Faux,*
   94 F. Supp. 3d 258 (D. Conn. 2015) ...................................................... 27, 29

*United States v. Garcia,*
   413 F.3d 201 (2d Cir. 2005) .......................................................................... 33

*United States v. Groezinger,*
   625 F. Supp. 2d 145 (S.D.N.Y. 2009) ...................................................... 7, 29

*United States v. James,*
   113 F.3d 721 (7th Cir. 1997) ............................................................. 6, 28, 29

*United States v. Jones,*
   748 F.3d 64 (1st Cir. 2014) .......................................................................... 43

*United States v. Julian,*
   427 F.3d 471 (7th Cir. 2005) ........................................................................ 36

*United States v. Kaiser,*
   609 F.3d 556 (2d Cir. 2010) ........................................................................ 45

*United States v. Kirsh,*
   54 F.3d 1062 (2d Cir. 1995) ...................................................................... 7, 26

*United States v. Larson,*
   112 F.3d 600 (2d Cir. 1997) ...................................................................... 7, 37

*United States v. LeMay,*
   260 F.3d 1018 (9th Cir. 2001) ...................................................................... 36

*United States v. Lifshitz,*
   2004 WL 2072468 (S.D.N.Y. Sept. 15, 2004) ...................................... 7, 29

*United States v. Martindale,*
   790 F.2d 1129 (4th Cir. 1986) .................................................................. 6, 26

*United States v. Mitchell,*
   966 F.2d 92 (2d Cir. 1992) ......................................................................... 6, 25

*United States v. Mound,*
   149 F.3d 799 (8th Cir. 1998) ........................................................................ 36

*United States v. Mound,*
   157 F.3d 1153 (8th Cir. 1998) ...................................................................... 38

*United States v. Murphy,*
   979 F.2d 287 (2d Cir. 1992) ......................................................................... 33

*United States v. Newton,*
   369 F.3d 659 (2d Cir. 2004) ...............................................6, 25, 26, 28

*United States v. O'Connor,*
   650 F.3d 839 (2d Cir. 2011) ......................................................................... 36

*United States v. Ortiz,*
   943 F. Supp. 2d 447 (S.D.N.Y. 2013) ........................................................ 27

*United States v. Ramos,*
 2012 WL 6708191 (D. Vt. Dec. 26, 2012) ............................................................ 7, 29

*United States v. Stamper,*
 106 F. App'x 833 (4th Cir. 2004) (per curiam) ........................................... 36

*United States v. Stone,*
 2013 WL 5274850 (D. Vt. Sept. 18, 2013) ............................................................ 7, 29

*United States v. Vonneida,*
 601 F. App'x 38 (2d Cir. 2015) ................................................................... 36

**Statutes and Other Authorities**

18 U.S.C. § 2422(a) ................................................................................................ 2

18 U.S.C. § 2422(b) ................................................................................................ 2

18 U.S.C. § 3231 ...................................................................................................... 1

28 U.S.C. § 1291 ...................................................................................................... 1

28 U.S.C. § 2072 .................................................................................................... 38

28 U.S.C. § 3742(a) ................................................................................................ 1

Empirical Fallacies of Evidence Law: A Critical Look at the
Admission of Prior Sex Crimes,
 81 U. CIN. L. REV. 795 (2013) ....................................................................... 41

Evidence of Propensity and Probability in Sex Offense
Cases and Other Cases,
 70 CHI.-KENT L. REV. 15 (1994) ................................................................. 40

Federal Rule of Evidence 413: A Dangerous New Frontier,
 33 AM. CRIM. L. REV. 57 (1995) ................................................................. 40

Fed. R. Evid. 403 ................................................................................ 8

Fed. R. Evid. 404(b) ......................................................................... 35

Fed. R. Evid. 413 ..................................................................... passim

Fed. R. Evid. 414 ............................................................................ 39

Floor Statement of Senator Bob Dole, 140 Cong. Rec. S12990,
    Sept. 20, 1994 ..........................................................................39

"*People v. Ewoldt*: The California Supreme Court's About-Face
on the Plan Theory for Admitting Evidence of an Accused's Uncharged Misconduct,"
    28 LOY. L.A. L. REV. 473 (1995) ................................................40

Recidivism of Sex Offenders Released from Prison in 1994, Dep't of Justice (2003) 41

Report of the Judicial Conference of the United States on the Admission of Character
Evidence in Certain Sexual Misconduct Cases,
    159 F.R.D. 51 (1995) ............................................................. 38, 40

The Politics Behind Federal Rules of Evidence 413, 414, and 415,
    38 SANTA CLARA L. REV. 961 (1998) ...........................................39

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———————————————

Docket No. 15-2516-cr

———————————————

UNITED STATES OF AMERICA,
Appellee,

-against-

GREGORY JOHN SCHAFFER, AKA John Archambeault,
Defendant-Appellant.

———————————————

APPEAL FROM A JUDGMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

———————————————————————————

BRIEF FOR APPELLANT GREGORY JOHN SCHAFFER

———————————————————————————

## Statement of Jurisdiction

This is an appeal from a final judgment rendered and entered on July 24, 2015, in the United States District Court for the Eastern District of New York (Hon. Allyne R. Ross). A notice of appeal was timely filed on August 6, 2015. This Court has jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). The district court had jurisdiction pursuant to 18 U.S.C. § 3231.

## Questions Presented

1.  Should appellant's un-*Mirandized* statement have been suppressed because he was in custody during an interrogation when he twice asked to leave and was twice told he was not free to do so?

2.  Should video evidence of appellant apparently sexually assaulting two young girls, who were completely unconnected to the current charges, have been excluded?

## Statement of the Case

Gregory John Schaffer was convicted after a jury trial of four counts: coercion and enticement to travel to engage in illegal sexual activity, in violation of 18 U.S.C. § 2422(a), coercion and enticement of a minor to engage in illegal sexual activity, in violation of 18 U.S.C. § 2422(b), attempted coercion and enticement to travel to engage in illegal sexual activity, in violation of 18 U.S.C. § 2422(a), and attempted coercion and enticement of a minor to engage in illegal sexual activity, in violation of 18 U.S.C. § 2422(b). On July 24, 2015, the court sentenced him to 300 months of incarceration for the two counts relating to enticement of a minor, and, running concurrently, 240 months of imprisonment for the other two counts. The court also imposed lifetime supervised release, and a special assessment of $400.

This Court continued the appointment of the Federal Defenders of New York as counsel on appeal under the Criminal Justice Act.

2

## Statement of Facts

Introduction

During the execution of a search warrant at appellant Gregory Schaffer's office, two agents interrogated Mr. Schaffer without reading him *Miranda* warnings. Twice during the interrogation, Mr. Schaffer asked to leave the office to visit a lawyer who lived nearby. Twice the agents told him he could not leave. In response to the agents' questions, he admitted that the office computer, which contained videos of the complainant changing into bathing suits and videos of unrelated sexual assaults, belonged to him, and that the email address used to contact the complainant belonged to him. He also provided agents the passwords to both the computer and the email address. Immediately after the search ended, the agents arrested Mr. Schaffer and he was indicted for four counts of coercion and enticement to engage in illegal sexual activity.

Before trial, defense counsel moved to suppress Mr. Schaffer's statements, arguing that he was in custody during the interrogation. The court denied counsel's motion and the prosecution introduced the statements at trial.

Counsel also moved to exclude videos that apparently showed Mr. Schaffer sexually assaulting two girls, who had nothing to do with the charges against him and were significantly younger than the complainant in this case. The court admitted these videos under Federal Rule of Evidence 413, and permitted the jury to consider the other crimes for any purpose. The court denied counsel's motion that Rule 413 and

the admission of these videos violated Mr. Schaffer's due process right to a fair trial and that the videos were more prejudicial than probative.

Motion to suppress statements taken without *Miranda*

At a suppression hearing, Officer <u>Robert Mancene</u> testified that he and eight other officers executed a search warrant at 3:30 or 4:00 p.m. on June 3, 2012 at Mr. Schaffer's office. A. 25-26.[1] When they entered, they told Mr. Schaffer they were executing a search warrant, and "held" him against a wall while they did a security sweep of the premises. A. 27-30. Mr. Schaffer agreed to speak with the agents and Mancene and another agent took him "down the hallway" to do so. A. 28-30. The agents told him he was not under arrest and allowed him to continue drinking his coffee and smoking his cigarettes as they questioned him for about an hour, over a two-hour time period. A. 30-31, 50, 61. At some points, Mancene got up to call the U.S. Attorney's Office and "someone else would sit there" with the other agent and Mr. Schaffer. A. 50.

During the interrogation, Mr. Schaffer asked if he should call an attorney and Mancene said that if he would like one, one could be present. A. 31. Mr. Schaffer said that he had done work for a lawyer named Jimmy Lisa, who focused in criminal law, worked up the block, and lived upstairs from the office. A. 32, 56-58. Mr. Lisa owed

---

[1] Numbers preceded by "A" refer to pages of the appendix, and those preceded by "T" refer to pages of the trial transcript.

him money that Mr. Schaffer wanted to collect to buy medicine he needed. A. 32, 48.

He was supposed to meet Mr. Lisa that day and asked the agents if he could leave to

do so. A. 56-58. Mancene said that he could not leave. A. 32. Mr. Schaffer asked to

leave a second time, and Mancene again said that he was "not free to leave." A. 32,

42-43, 46.

In response to these requests, Mancene said Mr. Schaffer was unable to exit the

office because there were boxes by the front doorway and it would be "somewhat of a

security issue" to "get through that." A. 32, 46. The office had a second exit, however,

which Mancene knew existed because the agents had already opened it, triggering an

alarm. A. 58-59. Mancene claimed not to remember whether Mr. Schaffer had made

an additional request to leave through this other door, but said he would have told

Mr. Schaffer he could not exit that way as well. A. 58-59. After the interrogation

ended, Mancene called the U.S. Attorney's Office and arrested Mr. Schaffer. A. 32-33.

Only at this point, after handcuffing him, did the agents read Mr. Schaffer the *Miranda*

warnings. A. 33.

In motion papers, counsel argued that Mr. Schaffer was in custody because a

reasonable person would not have felt free to leave when specifically told twice that

he could not leave to meet with a criminal defense lawyer and retrieve needed

medication. A. 8-9 (Dkt. Nos. 47, 55). Because he was not read his *Miranda* rights

before this custodial interrogation, counsel argued his statements should be

5

suppressed, citing *United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir. 1992); *California v. Beheler*, 463 U.S. 1121, 1125 (1983); and *Howes v. Fields*, 132 S.Ct. 1182, 1189-90 (2012). *Id.*

The government conceded that the agents told Mr. Schaffer that he "could not leave," but argued that he was not in custody because the restraint was "temporary," and he was only told that, because of a "security issue," he could not leave "at [the] point" that he asked to leave, not that at "no point [would he] be free to leave." A. 9 (Dkt. Nos. 50, 56).

The suppression court found that the factors weighing against a finding that Mr. Schaffer was in custody included that he was told he was not under arrest and was not physically restrained, and that the interrogation was in familiar surroundings, lasted about an hour, and he was allowed to drink his coffee and smoke cigarettes, citing, *United States v. Fnu Lnu*, 653 F.3d 144 (2d Cir. 2011); *United States v. Newton*, 369 F.3d 659 (2d Cir. 2004); *United States v. Badmus*, 325 F.3d 133 (2d Cir. 2003); *Mitchell*, 966 F.2d 92; *United States v. Abbas*, 418 F. Supp. 2d 280 (W.D.N.Y. 2006); *United States v. James*, 113 F.3d 721 (7th Cir. 1997); and *United States v. Martindale*, 790 F.2d 1129 (4th Cir. 1986). A. 93.

On the other hand, that Mr. Schaffer had asked twice if he could leave and was told he could not do so because the "boxes stacked near the doorway" "could potentially compromise the security of the investigation" weighed in favor of a finding

6

that he was in custody. A. 94. The court stated that the denials of his requests to leave "suggest[ed]" that his "freedom of movement may have been curtailed" to "some degree." A. 94. According to the court, however, this situation was "[m]ost similar" to that of the defendant in *United States v. Groezinger*, 625 F.Supp.2d 145 (S.D.N.Y. 2009), who was not in custody when he was told that he could not leave his kitchen and was going to be "late" for his train. A. 95-96 (also citing *United States v. Stone*, 2013 WL 5274850 (D. Vt. Sept. 18, 2013); *United States v. Ramos*, 2012 WL 6708191 (D. Vt. Dec. 26, 2012); *United States v. Lifshitz*, 2004 WL 2072468 (S.D.N.Y. Sept. 15, 2004); and *United States v. Kirsh*, 54 F.3d 1062 (2d Cir. 1995)).

The court held that Mr. Schaffer was not in custody. *Id.*

Motion to introduce videotapes of unrelated sexual assaults

Under Federal Rule of Evidence 413, the government moved to introduce almost 100 minutes of video of Mr. Schaffer interacting sexually with two minor girls who had no connection to the indicted offenses, asserting that these videos were relevant to show Mr. Schaffer's "sexual attraction to children" and his "inten[t] to sexually assault the [complainant] at the time he communicated with her." A. 8 (Dkt. No. 46, citing *United States v. Larson*, 112 F.3d 600 (2d Cir. 1997); *Morris v. New York*, 2008 WL 850679 (E.D.N.Y. Mar. 29, 2008)).

In the government's description, in the first two videos, Mr. Schaffer "direct[ed] a young girl" of about 8 or 9 years old to try on three bathing suits. The

7

girl changed "several times," he "adjust[ed]" the suits, "fondle[d]" her body, and she sat on his lap. She "eventually perform[ed] oral sex" on him. The second video showed Mr. Schaffer "fondl[ing]" the same girl and "either ha[ving] sexual intercourse with her or masturbat[ing] on top of her." These videos were edited to "progress at a rapid speed" and lasted about six minutes each; neither had sound. A. 8 (Dkt. No. 46).

The other videos, which included sound and lasted about 87 minutes, depicted a different girl, who was about 12 or 13 years old, in a hotel room. Mr. Schaffer told the girl that he was an FBI agent and former Navy Seal, offered to give her basketball tickets, and a laptop. She tried on bathing suits, sat on the bed naked, and went with Mr. Schaffer, off-camera, into the bathroom. A "Dora the Explorer backpack" could be seen in the background. A. 8 (Dkt. No. 46).

Defense counsel argued that introducing videos of unrelated sexual assaults into evidence would violate Mr. Schaffer's Fifth Amendment Due Process rights. A. 9 (Dkt. No. 51). She also argued that Mr. Schaffer's alleged interest in children was not relevant because the complainant was almost 16 years old, while the other videos depicted prepubescent children against whom sexual crimes are "separate, distinct and more serious" than sexual assault crimes against teenagers or adults. Alternatively, counsel argued that any relevance was outweighed by the prejudicial effect, citing Federal Rule of Evidence, Rule 403, because of the "volume and inflammatory nature" of the videos, which were almost 100 minutes long.

The court found that, under Rule 413, evidence of prior sexual assaults is presumptively admissible. A. 96. It held that Mr. Schaffer's "sexual interest in minor females [was] extremely relevant to the question of his intent here," and concluded that the videos showed a "pattern" of Mr. Schaffer "enticing girls into situations in which they are alone with him and making them try on swimsuits before forcing them to engage in sexual conduct." A. 97.

The court disagreed that the videos were "more serious or inflammatory" than the allegations in the current case, saying that, while the court had "more concern" about the younger girl, it was "satisfied" that neither of the other two girls was "identifiably younger than 15," saying that the girls "appear[ed] to be pre-teen or teenage, pubescent girls who could be attributed with an age range somewhere between 12 and 16." A. 99. The court also found that the prejudice was limited because the clips involved "only a minor amount of explicit content." A. 99. It allowed the videos to be introduced for the jury's consideration for "any issue." A. 11 (Dkt. No. 80 at 28). The court did not address counsel's constitutional arguments. A. 96-99.

The court also rejected counsel's request to instruct the jury that there were charges pending in New Jersey related to the other videos, to avoid the danger that the jury would be "left with an impression" that "nothing [was] being done to address" that conduct. A. 11 (Dkt. No. 80 at 25-26).

9

The Trial

Opening Statements

In the government's opening statement, it told the jury they would see "other videos that showed the defendant in sexual situations with other children. One showed the defendant in bed with a naked girl. Another showed the defendant receiving oral sex from a different young girl." T. 18-19. The prosecutor repeated that the jury would "see other videos, including videos of the defendant in sexual situations with other children." T. 20.

In a brief opening statement, defense counsel admitted that the evidence would show that Mr. Schaffer "took advantage" of a teenage girl, but argued it would not show that he enticed or coerced her to travel with the intent of engaging in illegal sexual activity. T. 21. She told the jury that they were not "here to judge" Mr. Schaffer's character, but rather to decide if the government had proved the specific charges. T. 21-22.

Prosecution Case

In March 2012, Strasia Sierra posted an ad on Craigslist for a part-time retail job. T. 26-27. Someone named John responded from the email address paramountpics1@aol.com (referred to throughout as "paramountpics") saying he was looking for help at a store in the Newport Mall in Jersey City. T. 29, 33. Paramountpics and Ms. Sierra exchanged a number of "all business" emails about the

10

job. T. 89, 91. Paramountpics asked her age, what she was looking for in a job, and what she was planning to do for college. T. 34. She sent her resume, said she was one month shy of her 16th birthday, and that she would need to work around her high school schedule. T. 32. T. 22-23, 35. He said that he had job openings at stores he owned, including American Eagle Outfitters, Champs Sports, Victoria's Secret, and Spencer's Gifts. T. 22-23, 35, 38.[2]

Paramountpics asked when she was free for an interview. T. 33-34. She asked where the interview would occur so she could tell her parents, and they arranged to meet at his office at 559 Newark Avenue in Jersey City that Saturday. T. 33-34, 36, 38-39. Paramountpics provided a phone number, told her to ask for "John Archambeault" when she arrived, and to bring her working papers. T. 38-41.

On March 17, 2012, Ms. Sierra called the number she had been provided and let the person who answered know that she was bringing a friend with her. T. 41-42. That person did not suggest that they reschedule the interview or tell her not to bring her friend, but just said that the friend could wait outside of the office during the interview. T. 42, 93-94.

When she arrived at 559 Newark Avenue, Mr. Schaffer, who was 33 years old, answered the door. T. 44, 171. They greeted normally, talked for a few minutes, and he asked her to fill out some employment forms. T. 45, 47-50. She told Mr. Schaffer,

---

[2] The parties stipulated that none of these stores had a record of employment for Mr. Schaffer or Mr. Archambeault. T. 147-49.

whom she called John, that she had "recently smoked marijuana" and did not want to answer the question about drug testing; Mr. Schaffer assured her she did not need to answer every question on the forms. T. 50.

She nonetheless responded "yes" to the questions asking if she had a boyfriend and whether she was "active," which she took to mean sexually active. T. 51. The form also asked whether she had intercourse, whether she had wanted to do so, and how far she had gone "with that." T. 51-52. It asked her to "explain how you feel about men" and to describe the "riskiest thing" she would "ever do"; she wrote that men are "very powerful" and that she "would do anything risky as long as it is going to make things better on my behalf." T. 53.

She realized that the form was asking about her sexuality, but "didn't question" it because she had "never had an interview before" and "wasn't sure if that was a part of an interview or not." T. 52-53. She did, however, have other experience applying for jobs, which she had been doing by walking into stores and applying in person. T. 99. None of these other potential employers had asked her about her sex life. T. 99. After filling out the forms, she and Mr. Schaffer spoke about her boyfriend, losing her virginity, and other sexual things. T. 54.

He also asked her why she wanted a job, and she said it was to help her great-grandmother pay her bills. T. 54-55. After about two hours, he told her she had gotten the job, that she should have her great-grandmother sign a permission slip so

she could get working papers, and that she should come back the next day by herself to start work. T. 55-56. She was "really excited" and told everyone she had gotten a job. T. 56-57. She did not mention to anyone that she had been asked any strange questions about her sexuality during the interview. T. 102.

Via email with paramountpics, she confirmed that she would bring her papers, that she should treat the next day as her first day on the job, and that she would not bring anyone else. T. 60. She arrived at Newark Avenue the next day, March 18, around 4 p.m. T. 60. Either that day or the day before, Ms. Sierra saw a second man in the office, but, on this second day, she again met with Mr. Schaffer. T. 61, 94. He gave her a few additional documents, which she assumed were standard, including a confidential disclosure agreement between her and a company called "GTA." T. 63-64, 231-32. After she signed the documents, he asked her to read them again. T. 65. She realized that she had signed a document "agree[ing] to open mouth kissing" and other sexual activity. T. 66-67. This document was not introduced into evidence. T. 100.

She was in shock because she "didn't want to do any of those things with him" adding that she "had a boyfriend." T. 67. She asked him to "get rid" of the document, but he said that if she did not follow it, he could sue her great-grandmother for breach of contract and call the police on her boyfriend because she was a minor and her boyfriend was not. T. 67.

One of these forms stated that she would be asked to try on products and comment on them, and Mr. Schaffer asked her to try on clothing and bathing suits. T. 68, 101. He left the room while she changed. T. 69. Once she had each suit on, he asked if he could adjust the suits for her and he "put his fingers under the bathing suit and move[d] it around to fix it." T. 69. He put his fingers near her breasts, her groin, and her behind. T. 69. At some point he took out a camera, asked if she had thought about modeling, and whether he could take pictures for his friend's magazine. T. 69. She said okay and also said he could pose with her. T. 70-71. He put on a swimsuit as well, and put his hands over her groin area and her breasts on top of the swimsuit. T. 71. The prosecution introduced videos of Ms. Sierra changing into and trying on the bathing suits. T. 279-81, 283.

When she said she was uncomfortable, he reminded her about the contract she had signed and said she "had do something for [him]" "to get rid of" it. T. 72. She tried to reach for her phone, but he blocked her. T. 73. She said she would "do anything just to get out of the contract" and he told her to get on the table. T. 73-74. She testified that he asked if she was on birth control, put something he said was birth control in her vagina, and then had sex with her. T. 73-74.

Afterward, she got dressed, sat down, and they spoke. T. 75. He told her she had signed a confidentiality agreement and could not tell anyone what had happened. T. 75. He shredded the document she had signed relating to sex, and printed a new

14

contract without the "sex part" for her to read over and sign. T. 75. She left his office around 6 or 7 p.m. T. 76. Later, she told her boyfriend what had happened, gave him the documents, and told him to throw them out. T. 76.

On March 19, 2012, she received an email from paramountpics, saying that there was "good news" and "that a friend of mine is going to hire you in Kings Plaza right there in Brooklyn. Let me know what you want to do." T. 77. Because she did not want to talk to him, she said that she had gotten detention that day. T. 78. In a second email, however, on March 22, she asked if he had a "sales job" and said that a job in New Jersey was fine. T. 79. She told him she was "in Queens now" because he did not want him to try to find her. T. 79, 105-06. This email about Queens was the last one she wrote to paramountpics. T. 106. In the following days, she told her teacher about the incident, the teacher told a counselor, and the counselor called the police. T. 80. Ms. Sierra gave the police her email address and password. T. 80-81.

Officer <u>Damon Gergar</u> took over Ms. Sierra's email account and began corresponding with paramountpics as if he was Ms. Sierra. T. 108. This correspondence lasted for over two months, and the government introduced 85 emails into evidence. T. 110-11, 129. Gergar said the first email he sent to paramountpics was the one about being in Queens – the same one that Ms. Sierra said was the last one she had sent. T. 137.

In these emails, only Gergar used the word sex. T. 131-32. Paramountpics referenced Ms. Sierra trying on outfits and taking photos of her, but not having sex with her. T. 132. Instead of talking about sex, many of the emails from paramountpics referenced paperwork that Ms. Sierra needed to return to the office. For example, the officer, acting as Ms. Sierra, wrote, "I had fun last time I was there." T.115. Paramountpics responded by mentioning that he needed her paperwork to get her on the payroll, and asked, "[w]hat is it you liked or thought was fun?" T. 115. The officer said that "I thought the S-E-X- was fun. Just please don't tell my grandmother or anyone. Okay?" T. 116. Again, not mentioning sex, the next email from paramountpics said "Okay. Well, let me know. Also, like I said, I got you set up in a store in Manhattan." T. 116. Paramountpics added that she could "thank me when you come." T. 117.

On March 28, 2012, paramountpics asked if she was "okay with everything that day, like the trying on the different things, and you know, and did you like it?" T. 120. He also asked if she would be "okay with trying one or two more" and whether she "like[d] [him] or something." T. 118. The officer responded by asking if he "like[d] having sex with me or was I not any good?" T. 119. Paramountpics replied that he would "rather answer in person" and that she still needed to bring her paperwork for payroll. T. 119. He also asked if she was "still on the pill." T. 127.

16

On April 1, 2012, paramountpics asked if everything was okay because he had not heard from her and again told her she needed to bring in her papers so that her payroll would be in order. T. 123-26. Gergar made no attempt to find out what paperwork this was or ask for an additional copy of the paperwork, although he admitted these papers would likely have had evidentiary value. T. 112, 113-15, 136. Gergar, as Ms. Sierra, arranged to go back to the Jersey City office on June 3, 2012. T. 127-28.

<u>Execution of the search warrant and interrogation</u>

On June 3, 2012, nine officers executed a search warrant at 559 Newark Avenue. A. 122-23. In testimony similar to that of the suppression hearing, Officer <u>Robert Mancene</u> said that he and Agent Megan Buckley interrogated Mr. Schaffer for over an hour. A. 125-26. During the interrogation, Mr. Schaffer said he worked in IT and owned an unincorporated company, called G&F, but did not own any retail stores. A. 127. Mr. Schaffer told the agents that he was starting an apparel business and planned to use various pictures of women that were in his office in connection with the business. A, 173. The officers found a wholesale business application for "GTA apparel," two New Jersey sales tax certificates for "GTA," a wholesale business application for American Apparel and stockroom.com, and invoices for large orders of apparel from American Apparel, stockroom.com, and Fantasy Lingerie. A. 136-39, 143, 176-80, 184-85.

17

Mr. Schaffer initially denied knowing anyone named John Archambeault, but later said that some packages had been delivered to his business with that name and that he had signed for them. A. 128. He also admitted knowing two people who were possibly using the name John Archambeault. A. 128-29. Mr. Schaffer also initially denied knowing Ms. Sierra, but later said that he did know her and that he had considered giving her an interview. A. 129. The officers found a folder on Ms. Sierra, including a cover letter, questionnaires, and a letter signed by her great-grandmother. A. 130.

The officers found a blank document, which Mr. Schaffer said was a joke, with "Sex Contract" written in bold on the top, with clearly delineated sections for different types of contact, including "touching" and "kissing." A. 133-36, 188. The office had a doorjamb sex swing, toy replica of a vagina, a container of Astroglide lubricant, a vibrator, two condoms, a penis pump, an "ultimate anal douche," and "other items of a sexual nature." A. 159-63. They also found an item "consistent with the spermicidal birth control" that Ms. Sierra said was "inserted into her vagina." A. 163.

<u>Evidence from the computer and paramountpics1@aol.com email address</u>

During the interrogation, Mr. Schaffer admitted that the office computer was his and provided agents its password. A. 165. A computer folder titled "New Talent" contained the videos of the unrelated sexual assaults that were the subject of the pre-

18

trial motion. A. 164. Over counsel's continuing objection, the prosecution played the four videos, and the court told the jury that Mr. Schaffer had "not been charged with those crimes." A. 202-03, 206. The videos of Ms. Sierra trying on bathing suits were also found on this computer. T. 279-81, 283.

He also admitted he controlled the email address "paramountpics1@aol.com" and provided agents the password. A. 128, 189. The government introduced emails sent and received from this address unrelated to Ms. Sierra, including emails offering free cars in exchange for sexual encounters, emails in response to a Craigslist posting seeking a store manager who would provide "some personal benefits every so often" and "must be okay with doing things the way I say no matter what," and emails in response to a Craigslist posting for an "Ambitious teen looking for work," saying that the employer was a producer looking for "new talent." A. 107-10, 116-21.

<u>Summations</u>

In summation, the prosecutor asked the jury to think "about the e-mails between the defendant and other people and the videos of the other girls." T. 304. The prosecutor focused on the videos of the other "young girls" as "pro[of] that the defendant is sexually attracted to young girls." T. 304. The prosecutor used these videos to argue that "[s]eeing and touching young girls in bathing suits turns this defendant on. Think back to the videos showing the other girls, girls who started out in swimsuits and ended up in sexual situations. Just as was the case with those other

19

girls, the defendant wanted [the complainant] in those bathing suits because it turned him on sexually." T. 308.

According to the prosecutor, the videos followed a "remarkably similar pattern to what happened" in this case because they "show young girls in bathing suits, just like [the complainant]. A. 208-09; T. 304-05. He added that the videos "show girls who were eventually coerced into engaging in sexual acts or found themselves in sexual situations with the defendant, just like [the complainant]." A. 208-09; T. 304-05. The prosecutor concluded that "[g]iven the defendant's manipulation of the other girls in those videos, there's no reason to believe that he intended to do anything different with [the complainant]." A. 209; T. 305.

Defense counsel argued that Mr. Schaffer was attempting to establish an adult apparel and sex toy business and that he had the complainant travel to his office intending to take racy pictures of her for his business. T. 325-26. The government, therefore, had not proved that Mr. Schaffer intended to sexually assault her when he invited her to his office. T. 317. It was "more likely" that the sexual conversation did not start until the second day that the complainant traveled to New Jersey. T. 317. With respect to the other videos, counsel argued that they indicated that if Mr. Schaffer had "sex with [the complainant], he would have filmed it and he would have kept it." T. 322.

Counsel also argued that the government failed to prove Mr. Schaffer's intent related to illegal sexual activity with respect to the counts of attempted enticement, arguing that the emails that Mr. Schaffer exchanged with Gergar showed only that he was trying to get the complainant to return to his office to bring back paperwork. T.330-31. She also argued that because of the stark difference in tone between the complainant's emails and those written by Gergar, that Mr. Schaffer would have had "concerns" about whether it was really the complainant writing these emails and was trying to set up a meeting to find out what was going on. T. 331.

Charge and Sentence

The court charged the jury with four counts: The first two counts, relating to the time period between March 15 and 18, were coercion and enticement to travel to engage in sexual assault and coercion and enticement of a minor over the internet to engage in illegal sexual activity. The second two, relating to the time period between March 19 and May 18, were attempted coercion and enticement to engage in sexual assault and attempted coercion and enticement of a minor over the internet to engage in illegal sexual activity. T. 352-63.

The court instructed the jury that the Rule 413 videos "show[ ] that the defendant engaged in other conduct which was similar in nature to the facts charged in the indictment," that this evidence of the "defendant's commission of another offense or offenses of illegal sexual acts with a minor is admissible and may be

21

considered for its bearing on whether the defendant committed the offenses for which he is charged in the indictment." A. 210. The court added that "evidence of another offense on its own is not sufficient to prove the defendant guilty of the crimes charged in the indictment," that the jury should "bear in mind" that the government has the "burden of proving" guilt beyond a reasonable doubt, and that the defendant is "not on trial in this case for any act, conduct, or offense that is not charged in the indictment." A. 210.

The jury convicted Mr. Schaffer of all four counts and the court sentenced him to 300 months of incarceration.

## Summary of Argument

During an interrogation that lasted at least an hour, Mr. Schaffer made inculpatory statements, including admitting that he owned a computer and email address with evidence of the crimes and providing the passwords to access both. There was no dispute that these statements were made in response to un-*Mirandized* interrogation by two officers while seven additional officers swarmed Mr. Schaffer's office. There was also no dispute that, twice, Mr. Schaffer asked if he could leave, explaining that he wanted to see a nearby criminal defense lawyer, and was twice told he was not free to do so. Immediately after the interrogation ended, Mr. Schaffer was formally arrested. Under these circumstances, the court's conclusion that Mr. Schaffer

22

was not in custody was erroneous. Instead, this Court should reverse Mr. Schaffer's conviction, find that Mr. Schaffer was in custody, and suppress his statements.

This Court should also reverse Mr. Schaffer's conviction because the court should not have allowed videos of two unrelated sexual incidents into evidence. Federal Rules of Evidence, Rule 413, allows unrelated sexual crimes to be introduced into evidence for any purpose. This rule weakens the presumption of innocence, dilutes the government's burden of proof, and, in this case, ensured Mr. Schaffer would be convicted based on these other apparent sexual assaults no matter what the government proved about his intent with respect to the complainant. The Court should hold, therefore, that Rule 413 violated Mr. Schaffer's due process right to a fair trial. Alternatively, this Court should hold that the videos should have been excluded because they were more prejudicial than probative.

## Argument

### Point I

> Appellant's un-*Mirandized* statement should have been suppressed because he was in custody during an interrogation when he twice asked to leave and was twice told he was not free to do so.

While seven agents swarmed his office and two additional agents interrogated Mr. Schaffer about criminal activity, Mr. Schaffer twice asked to leave and was twice explicitly told that he was not free to do so. He was not told that he would be able to leave later and in fact was never allowed to leave, as he was arrested immediately after

23

the interrogation. A reasonable person in this situation would have understood this unequivocal prohibition on leaving the office – even to go visit a nearby criminal defense attorney – meant that his freedom of movement was curtailed to the same degree as if he were under arrest. In holding otherwise, the district court improperly concluded that this unambiguous restraint on his movement was outweighed by the fact that the agents initially told him he was not under arrest, interrogated him for only about an hour, and that he was in familiar surroundings. This Court should find that the district court's conclusion Mr. Schaffer was not in custody was erroneous.

A.    Standard of review.

On appeal, a court's decision on a suppression motion is reviewed *de novo*. *United States v. Fnu Lnu*, 653 F.3d 144, 148 (2d Cir. 2011). The court's factual findings are reviewed for clear error. *United States v. Carter*, 489 F.3d 528, 534 (2d Cir. 2007).

B.    *Miranda* warnings are required before custodial interrogation.

A person is "in custody" without a formal arrest when "law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave." *United States v. Badmus*, 325 F.3d 133, 138 (2d Cir. 2003) (citation and internal quotation marks omitted). The prosecution "may not use statements . . . stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination," including advising the accused of the right to remain silent and the right to counsel. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

24

The test to determine custody is whether a reasonable person in "the suspect's position" would have understood himself to be "subjected to restraints comparable to those associated with a formal arrest" and "felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995); *Georgison v. Donelli*, 588 F.3d 145, 155 (2d Cir. 2009) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 441 (1984)). *Accord United States v. Newton*, 369 F.3d 659, 670 (2d Cir. 2004) (the "ultimate inquiry" is a whether there is a "'restraint on freedom of movement' of the degree associated with a formal arrest") (quoting *California v. Beheler*, 463 U.S. 1121 (1983)); *United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir. 1992) (test focuses on the "presence or absence of affirmative indications that the defendant was not free to leave").

The factors to consider include the interrogation's duration and location, whether the suspect volunteered for the interrogation, whether the officers used restraints, whether weapons were present or drawn, whether officers told the suspect he was free to leave or under suspicion, the type of questions asked, and whether the suspect was released at the end of the questioning. *Howes v. Fields*, 132 S. Ct. 1181, 1189 (2012); *Fnu Lnu*, 653 F.3d at 153.

Weighing these factors, courts have concluded that defendants are not in custody when they are specifically told that they can leave, *Fields*, 132 S. Ct. at 1193 ("told at the outset of the interrogation, and was reminded again thereafter, that he

could leave and go back to his cell whenever he wanted"); *United States v. Kirsch*, 54 F.3d 1062, 1067 (2d Cir. 1995) (told that she could "leave if she liked and she could stay, if she liked"); *Badmus*, 325 F.3d at 139 (2d Cir. 2003) (agents said that they would leave if the defendants asked them to do so); *United States v. Martindale*, 790 F.2d 1129, 1133 (4th Cir. 1986) (at liberty to terminate the discussion and to go his way anytime he chose), or during situations that are "presumptively temporary and brief," such as roadside or *Terry* stops, or questioning at the border. *McCarty*, 468 U.S. 420 (noting that roadside stops take place in public and are relatively non-threatening); *Fnu Lnu*, 653 F.3d at 153 (a reasonable traveler at the border "will expect some constraints as well as questions" so "one need not fear the coercion present in stationhouse interrogations"). Additionally, that a suspect is actually allowed to leave after the interrogation weighs in favor of a finding that he was not in custody. *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (defendant came voluntarily to the police station, was informed that he was not under arrest, and did in fact leave the police station without hindrance after the interrogation).

Although location matters to custody, when freedom of movement is sufficiently curtailed, a defendant can be in custody even in his home. *E.g., Orozco v. Texas*, 394 U.S. 324 (1969) (four officers questioned defendant in his bedroom at 4:00 a.m.); *Newton*, 369 F.3d at 676-77 (handcuffed defendant in home); *United States v. Ortiz*, 943 F.Supp.2d 447, 455-56 (S.D.N.Y.2013) (officers threatened to arrest

26

everyone in apartment unless information was provided). That the location is full of law enforcement officers can contribute to a finding that a person is in custody, even if that location is familiar to the person. *E.g., United States v. Faux*, 94 F. Supp. 3d 258, 274 (D. Conn. 2015) ("fact that the individual's home is overrun with law enforcement officials may also bear on custody"); *United States v. Craighead*, 539 F.3d 1073, 1084-89 (9th Cir. 2001) (defendant in custody when questioned in closed-door room, in police-dominated home, with armed law enforcement blocking exit).

C.    Appellant was in custody during his hour-long interrogation when he was told twice that he could not leave to see a lawyer.

When the federal agents first said that Mr. Schaffer was not free to leave, a reasonable person would have believed that the agents were restricting his movement. After the agents also denied his subsequent request to leave, a reasonable person would have concluded this restriction was not temporary. This reasonable conclusion was conclusively confirmed when Mr. Schaffer was arrested immediately after the interrogation ended. These circumstances were not merely a "suggest[ion]" that Mr. Schaffer's "freedom of movement" was curtailed to "some degree," as the district court held. Instead, the only reasonable conclusion was that his movements were completely curtailed as if he was in custody. None of the factors cited by the district court dispel this conclusion.

First, the district court pointed to the fact that Mr. Schaffer was told he was not under arrest, citing *Newton* for the proposition that the "fact that defendant was told

27

he was not under arrest is an important factor in evaluating whether" he was in

custody. A. 93. That the suspect is told he is not under arrest, however, cannot be

considered in a vacuum. In *Newton*, this Court concluded the defendant *was* in custody

because the fact that he was handcuffed undercut the officer's statement that he was

not under arrest. *Newton*, 369 F.3d at 676-77. Similarly, here, the agent's original

statement that Mr. Schaffer was not under arrest was undercut by the subsequent

statements that he was not free to leave. Like the defendant in *Newton*, once Mr.

Schaffer's movement was curtailed, he was never told that this restraint would be

temporary. *Id.*

Second, the district court weighed too heavily that Mr. Schaffer was in his

office and allowed to continue drinking his coffee and smoking his cigarettes, in

finding that the surroundings were not coercive, citing *Badmus*, 325 F.3d at 139, *United*

*States v. Abbas*, 418 F. Supp. 2d 280 (W.D.N.Y. 2006) and *United States v. James*, 113

F.3d 721 (7th Cir. 1997). None of these cases support the court's conclusion: in

*Abbas*, the defendant *was* in custody even though he was at his place of work. *Abbas*,

418 F. Supp. 2d 280 (defendant confronted with evidence of criminality,

fingerprinted, and premises blocked by one of the agents). And in *Badmus*, unlike here,

the agents told the defendants that they would leave if the defendants asked them to

do so, *Badmus*, 325 F.3d at 139, while, in *James*, the defendant never asked to leave his

office, was in fact allowed to step outside to smoke, and was not arrested at the end of

28

the interview. 113 F.3d 721, 725. *See also United States v. Stone*, 2013 WL 5274850 (D.

Vt. Sept. 18, 2013) (agents made it clear that defendant was not obligated to speak

with them and could terminate the interview at any time); *United States v. Ramos*, 2012

WL 6708191 (D. Vt. Dec. 26, 2012) (D. Vt. Dec. 26, 2012) (defendant told he "could

ask them to leave at any point"); *United States v. Lifshitz*, 2004 WL 2072468, at *7

(S.D.N.Y. Sept. 15, 2004) (no evidence defendant ever stated that he wanted to end

the interview, asked to leave, or tried to leave). Additionally, the district court failed to

consider that although Mr. Schaffer was in a familiar environment, his small office

was being overturned by and overrun with law enforcement agents, which would only

have contributed to the coercive atmosphere of the interrogation. *See Faux*, 94 F.

Supp. 3d at 274.

Third, the court did not explain how the length of the interrogation – at least

an hour over a two-hour period – was so minimal as to dispel the reasonable

impression that Mr. Schaffer was in custody. In contrast to roadside stops or border

questioning, nothing about the circumstances here suggested the interrogation would

be brief or temporary, or that Mr. Schaffer could leave when it ended.

Finally, the circumstances were not, as the suppression court concluded, "most

similar" to those in *United States v. Groezinger*, 625 F. Supp. 2d 145, 158 (S.D.N.Y.

2009). In *Groezinger*, the interrogating agents told the defendant that he would be

"late" to his morning appointment, implying that he would be allowed to leave, just

not immediately. In stark contrast, the agents gave Mr. Schaffer no indication that he would be allowed to leave at a later point even though the reason Mr. Schaffer was asking to leave – to visit a nearby criminal defense attorney and get money for medication – was quite important. While the agents said he could not leave because of a "security issue," they did not tell him this "issue" was temporary and that he would be able to leave later.

Because Mr. Schaffer was in custody, his statements made without the benefit of the *Miranda* warnings should be suppressed.

D.    <u>The failure to suppress appellant's statements was harmful.</u>

For constitutional errors, the government must show "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California*, 386 U.S. 18, 24 (1967). "To say that an error did not contribute to the verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question." *Graham v. Hoke*, 946 F.2d 982, 994 (2d Cir. 1991) (citation omitted). Here, the erroneous admission of Mr. Schaffer's statements was not harmless beyond a reasonable doubt.

These statements allowed the prosecution to use Mr. Schaffer's own words to fill in crucial gaps in their proof. He admitted that the paramountpics email address belonged to him even though a different name was used on the account, and he provided officers the password to the account. Without this information, the prosecution may have had difficulty connecting Mr. Schaffer to the emails asking the

30

complainant to come to New Jersey – a crucial element of the prosecution's proof

that he enticed the complainant, using the internet, to travel for an illegal purpose.

Without the password to the account, it also may not have been able to access the

emails offering free cars in exchange for sex, which bolstered the prosecution's

argument that Mr. Schaffer had a pattern of offering illusory benefits in exchange for

sexual favors.

Mr. Schaffer also admitted that the computer in the office was his and provided

agents the password. This computer contained essential pieces of the prosecution's

evidence, including video of the complainant changing into bathing suits and videos

of unrelated sexual assaults. Without Mr. Schaffer's password, the prosecution may

not have been able to access these videos at all.

Additionally, Mr. Schaffer's statements also contained crucial inconsistencies:

Mr. Schaffer first said he did not know the complainant and then admitted he did

know her; he first denied knowing the name John Archambeault but later agreed he

had heard it. The jury would likely have viewed these comments as consciousness of

guilt.

Each of these admissions foreclosed possible defenses: the defense could not

argue that the government had not proved that Mr. Schaffer was behind the

paramountpics emails, they could not argue that someone else, such as Mr.

Archambeault or the second man the complainant had seen in the office, could have

31

been the owner of the email account, and they could not argue that the computer with the other videos belonged to someone else. Because these statements were damaging to the defense, their erroneous admission was not harmless beyond a reasonable doubt.

This Court should, therefore, reverse Mr. Schaffer's conviction, suppress his statements, and order a new trial.

Point II

Video evidence of appellant apparently sexually assaulting two young girls, who were completely unconnected to the current charges, should have been excluded.

Mr. Schaffer raised a defense about one element of the charged crimes, that the government had not proved he intended to sexually assault the complainant when he told her to travel to meet him. The jury had all the relevant evidence necessary to resolve this question. It heard the complainant's testimony, it read all the emails between the complainant and paramountpics1@aol.com – an address Mr. Schaffer admitted was his – and it saw videos of the complainant changing into bathing suits from the computer Mr. Schaffer admitted was his. In this context, there was no justification for introducing video evidence of Mr. Schaffer apparently sexually assaulting two completely unrelated girls, both of whom were much younger than the complainant.

These videos were admitted under Federal Rules of Evidence, Rule 413, which allows evidence of entirely unrelated sexual assaults to be used against a defendant as proof of his guilt of a charged sexual assault. This rule undercuts basic principles of the criminal justice system by allowing a defendant to be convicted based on general propensity rather than guilt of the specific offense charged, thus diluting the presumption of innocence and the burden of proof. This Court should, therefore, hold that, on its face, Rule 413 violates a defendant's fundamental due process right to a fair trial. Additionally, it should find that, because of the particularly graphic nature of the evidence introduced here, that Rule 413, as applied to Mr. Schaffer, violated his due process rights. Alternatively, it should find that the videos should have been excluded because any possible probative value was vastly outweighed by the prejudicial effect.

A.    Standard of review.

This court reviews the constitutionality of statutes *de novo*, *United States v. Murphy*, 979 F.2d 287, 289 (2d Cir. 1992), and reviews whether evidence was properly admitted for abuse of discretion. *United States v. Garcia*, 413 F.3d 201, 210 (2d Cir. 2005).

B.    The videos should have been excluded because Rule 413 violates due process protections by allowing evidence of propensity to commit sexual assaults to prove guilt of a specific crime.

One of the fundamental principles of the criminal justice system is that a defendant's guilt of the specific charged crime must be proved beyond a reasonable

33

doubt. *See, e.g., In re Winship*, 397 U.S. 358, 363 (1970) (internal citation omitted) (presumption of innocence is the "axiomatic and elementary" principle of criminal justice law). The due process clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Id.* at 364.

General propensity to commit criminal conduct may not be used as proof that the defendant committed the particular criminal act charged. *Old Chief v. United States*, 519 U.S. 172, 180-82 (1997) (it is improper to "generaliz[e] a defendant's earlier bad act into bad character and taking that as raising the odds that he did the later bad act now charged"). Our "whole tradition is that a man can be punished by criminal sanctions only for specific acts," "not for general misconduct." *Michelson v. United States*, 335 U.S. 469, 489 (1948) (we cannot send a person to prison for being "generally a bad man"). Evidence of general bad character or prior bad acts "weigh[s] too much with the jury and [risks] overpersuad[ing] them as to prejudge one with a bad general record and deny [the defendant] a fair opportunity to defend against a particular charge." *Old Chief*, 519 U.S. at 180-82. *See also Dowling v. United States*, 493 U.S. 342, 352 (1990) (due process test asks whether introduction of the type of evidence is "so extremely unfair that its admission violates 'fundamental conceptions of justice'"); *Spencer v. Tex.*, 385 U.S. 554, 574 (1967) (Warren, C.J. concurring in part and dissenting in part) (noting that case law "suggest[s] that evidence of prior crimes

34

introduced for no purpose other than to show criminal disposition would violate the Due Process Clause").

This basic principle prohibiting propensity evidence is codified in the Federal Rules of Evidence, Rule 404(b), which prohibits the prosecution from using crimes or other bad acts to show a defendant's character or prove that "on a particular occasion the person acted in accordance with" that character. In sexual assault cases, however, this prohibition disappears. Rule 413 allows the prosecution to introduce evidence that the defendant committed any other sexual assault. F.R.E. 413(a). This evidence can be considered "on any matter to which it is relevant." F.R.E. 413.

By allowing other crimes to be considered for any purpose, including general propensity, Rule 413 drastically reduces the prosecution's burden of proof, contemplates no possibility that a sex offender could have changed, and risks jury verdicts based on the extreme stigma attached to people who have committed prior sex offenses rather than proof of guilt of a specific crime. A statute specifically designed to produce more convictions by allowing evidence that is unrelated to the charged crime violates the fundamental principles of our criminal justice system.

  a.  This Court should reject the conclusion that Rule 403 protects
      against the fundamental fairness problem inherent in Rule 413.

In recent years, the highest courts of Iowa, Washington, and Missouri have all held laws unconstitutional that, just like Rule 413, allow general propensity to commit sexual assault as proof of guilt. *E.g., State v. Cox*, 781 N.W.2d 757(Iowa) (2010) ("no

35

one should be convicted of a crime based on his or her previous misdeeds"); *State v. Gresham*, 269 P.3d 207, 210 (Wash. 2012) (allowing admission of past sex crimes for all purposes "irreconcilable" with specific requirement that other crimes be used only for limited purposes); *State v. Ellison*, 239 S.W.3d 603 (Mo. 2007) (defendant has "the right to be tried only on the offense charged").[3]

Neither this circuit nor the Supreme Court of the United States has yet addressed this issue. This Court has cited Rule 413 only twice, both times simply conducting the Rule 403 analysis of whether the other sexual assault evidence was more prejudicial than probative. *United States v. Donaldson*, 577 F. App'x 63, 65 (2d Cir. 2014); *United States v. O'Connor*, 650 F.3d 839, 853 (2d Cir. 2011). Similarly, this Court has only analyzed Rule 414 on evidentiary rather than constitutional grounds. *See United States v. Vonneida*, 601 F. App'x 38, 42 (2d Cir. 2015) (evidence of 24-year-old conviction not unduly prejudicial under Rule 403); *United States v. Davis*, 624 F.3d 508 (2d Cir. 2010); *United States v. Larson*, 112 F.3d 600, 605 (2d Cir. 1997) (other sexual

---

[3] On the other hand, closer in time to the passage of the rules, a few circuits rejected constitutional challenges to rules 413 or 414, finding that the requirements of Rule 403, that the court consider whether the prejudice from the evidence outweighs the probative value, sufficiently protected defendants' fundamental right to a fair trial. *United States v. LeMay*, 260 F.3d 1018, 1026 (9th Cir. 2001) ("as long as the protections of Rule 403 remain in place so that district judges retain the authority to exclude potentially devastating evidence, Rule 414 is constitutional"); *United States v. Enjady*, 134 F.3d 1427, 1432 (10th Cir. 1998) (rejecting due process and equal protection challenges to Rule 413); *United States v. Mound*, 149 F.3d 799, 801 (8th Cir. 1998) (same). *See also United States v. Julian*, 427 F.3d 471, 487 (7th Cir. 2005) (rejecting equal protection challenge); *United States v. Stamper*, 106 F. App'x 833, 836 (4th Cir. 2004) (per curium) (same).

assaults not too temporally remote to be admitted under Rule 414). This Court should now address this issue and find that the rule violates the due process clause.

This Court should reject the conclusion that the constitutional harms inherent in Rule 413 are ameliorated by the weighing of the probative value verses the danger of prejudice under Rule 403. Because Rule 413 assumes that propensity evidence is relevant in sexual assault cases, the 403 scale is unbalanced against the defendant in every case regardless of the prejudicial effect of the evidence. *See Davis*, 624 F.3d at 512 ("legislative sponsors of Rule 414 expected that convictions within its ambit would normally be admitted and that their prejudicial value would normally not be outweighed by the risk of prejudice"); *Morris*, 2008 WL 850679 (same under rule 413). That courts routinely allow sexual assault evidence despite Rule 403 illustrates that this rule is not acting as a meaningful protection from the due process violation. *See* A. 8 (Dkt. No. 46) (government's motion listing cases in which courts have allowed sexual assault evidence after a Rule 403 analysis).

Because Rule 413 weakens the normal protection of Rule 403, Rule 403 cannot save Rule 413 from unconstitutionality. Instead, Rule 413 ensures that once an individual is labeled a "sex offender," that individual's chances of being convicted of a sex offense will rise, regardless of the proof of guilt of that new offense.

37

   b. Rule 413 was designed to produce more sexual assault convictions
      based on the fundamentally flawed assumption that past commission
      of sexual assault proves guilt of a charged sexual assault.

Rule 413, and companion rules for child-molestation cases, Rule 414, and civil

cases, Rule 415, were passed in 1994 over strenuous objection, as part of the Violent

Crime Control and Law Enforcement Act of 1994. An "overwhelming majority of

judges, lawyers, law professors, and legal organizations [ ] opposed" the new

evidentiary rules. Report of the Judicial Conference of the United States on the

Admission of Character Evidence in Certain Sexual Misconduct Cases, 159 F.R.D. 51

(1995) (report had "highly unusual unanimity" with only one dissent from the

Department of Justice). *See also Johnson v. Elk Lake Sch. Dist.*, 283 F.3d 138, 151 (3d

Cir. 2002) ("Ever since their initial proposal, Rules 413–15 have been met with

hostility by the legal establishment"); *United States v. Mound*, 157 F.3d 1153 (8th Cir.

1998) (Arnold, J., dissenting from denial of rehearing en banc) (Rule 413 "runs

counter to a centuries-old legal tradition that views propensity evidence with a

particularly skeptical eye"). These new rules were not passed through the usual

evidentiary rules procedure. *See* Rules of procedure and evidence; power to prescribe,

28 U.S.C.A. § 2072 (giving the Supreme Court the power to prescribe evidentiary

rules). Instead of being proposed by the judicial branch, they were imposed directly by

Congress, without a committee or conference report, added by an amendment to the

Violent Crime Bill, with brief floor debate. 140 Cong. Rec. S12990-01 (explaining how

rules were proposed); *see* Michael S. Ellis, The Politics Behind Federal Rules of

38

Evidence 413, 414, and 415, 38 SANTA CLARA L. REV. 961, 962 (1998) (discussing the "inappropriate means through which the rules were enacted, the poor manner in which they were drafted, and the weak substantive foundation on which they are based).

The stated legislative purpose underlying rules 413-415 was precisely to dilute the fundamental principles of proof beyond a reasonable doubt and make it easier to convict individuals accused of sexual assault crimes. As Senator Bob Dole, one of two principal congressional sponsors of the new evidentiary rules explained, Congress wished to reduce acquittals based on "difficult credibility determinations" when the defendant "contends that the victim engaged in consensual sex and then falsely accused him." Floor Statement of Senator Bob Dole (140 Cong. Rec. S12990, Sept. 20, 1994). In this circumstance, "[k]nowledge that the defendant has committed rapes on other occasions is frequently critical in assessing the relative plausibility of these claims and accurately deciding cases that would otherwise become unresolvable swearing matches." *Id.*

The sponsors of these rules also asserted that people convicted of sexual assault crimes were more likely to reoffend than people convicted of other crimes, because they are "in a small class of depraved criminals," and that evidence of other crimes "is likely to be highly probative in relation to the pending charge." David J. Karp, Evidence of Propensity and Probability in Sex Offense Cases and Other Cases,

70 CHI.-KENT L. REV. 15, 24. (1994) (cited in 140 Cong. Rec. S12990 as "the views of the legislative sponsors" and "an authoritative part of its legislative history"). Congress intended that the "knowledge of the defendant's past behavior" be used to "foreclose reasonable doubt as to guilt in a case that would otherwise be inconclusive." *Id.* at 20.

While Congress was surely right that Rule 413 would result in an increased number of convictions for sexual assault crimes, its underlying assumption that past conduct was competent evidence of guilt of the charged crime was never supported by empirical evidence. *See* Miguel A. MaeEndez & Edward J. Imwinkelried, *"People v. Ewoldt*: The California Supreme Court's About-Face on the Plan Theory for Admitting Evidence of an Accused's Uncharged Misconduct,"* 28 LOY. L.A. L. REV. 473, 474 (1995) (citing studies showing that juries are highly persuaded by evidence of other crimes); Mark A. Sheft, "Federal Rule of Evidence 413: A Dangerous New Frontier," 33 AM. CRIM. L. REV. 57, 75-76 (1995) (citing lack of any "scientific foundation" for rules); Judicial Conference, 159 F.R.D. 51 (faulting new rules for "significantly diminish[ing]" "fundamental" protections without the justification of any empirical evidence).

Since the passage of these rules, criticism of the underlying assumption that past sex offenses are valid proof of future ones has only grown. *E.g.,* Tamara Rice Lave & Aviva Orenstein, "Empirical Fallacies of Evidence Law: A Critical Look at the

Admission of Prior Sex Crimes," 81 U. CIN. L. REV. 795 (2013) (no "unique qualities" make sex offenders "fiends, unalterably different from average people for whom propensity rules are necessary and justified"); Hal Arkowitz, Scott O. Lilienfeld, "Once a Sex Offender, Always a Sex Offender? Maybe not," April 1, 2008, http://www.scientificamerican. com/article/misunderstood-crimes/ (recidivist figures are "clearly out of alignment with the public's more dire expectations"). Even the Department of Justice has released a report debunking the stereotype that people convicted of sex offenses are at greater risk of recidivism than people convicted of other types of crimes. Patrick A. Langan, Erica L. Schmitt & Matthew R. Durose, Recidivism of Sex Offenders Released from Prison in 1994, Dep't of Justice, at 1 (2003) (finding that "the only group less likely to be rearrested for the same crime within three years than sex offenders were those convicted of homicide").

Given this utter lack of evidence that past sexual assaults indicate more about future criminality than past commission of other crimes, there is no justification for carving out an exception to the fundamental rule that propensity evidence cannot be used as proof of guilt for past sexual assault crimes. This Court should, therefore, hold that Rule 413, on its face, violates the due process clause.

      c. Admission of the other sexual assault evidence violated appellant's due process rights.

Additionally, this Court should find that the use of Rule 413 was particularly damaging as applied to Mr. Schaffer because the evidence introduced under this rule

was not just a stipulation about a prior conviction but videos graphically depicting

sexual assaults of young girls. The only natural reaction to the jury seeing the

heartbreaking videos of the other girls, who were completely unrelated to the

complainant, would have been to convict him regardless of the evidence in the

current case.

Moreover, the purpose underlying Rule 413 that more evidence is needed to

bolster the credibility of sexual assault victims was completely inapplicable because

Mr. Schaffer's case did not turn on "difficult credibility determinations" about

consent. In contrast to the type of he-said/she-said cases Congress was concerned

with in passing Rule 413, the jury here had a wealth of relevant information to analyze

in determining whether the government had proved the elements of the crime – it had

emails, video of the complainant, and testimony. In this context, allowing the other

sexual assault evidence for any purpose at all, including for "its bearing on whether

the defendant committed the offenses" charged, violated Mr. Schaffer's due process

rights. A. 210.

C.    The videos should have been excluded because they were more prejudicial than probative.

The Court should alternatively find that the district court abused its discretion

in finding that the probative value of the videos of unrelated sexual assaults

outweighed their prejudicial effect under Rule 403. "Even if no unfair prejudice arises

solely because the evidence rests on propensity, that hardly means that there are no

42

dangers to watch out for." *United States v. Jones*, 748 F.3d 64, 71 (1st Cir. 2014).
Evidence of other crimes can cause the jury to "condemn a defendant based on
passion or bias," be used by the jury as "evidence to convict because it is disgusted by
the defendant's criminal past rather than convinced that he did the crime charged," or,
a jury "unsure of guilt," may convict "anyway because it believes the other-crimes
evidence shows the defendant is an evildoer who must be locked up." *Id.*

Here, these risks were real. The jury in Mr. Schaffer's case would undoubtedly
have felt compelled to convict Mr. Schaffer on the strength of the evidence of the
other sexual assaults without even considering the specific crime charged. This is
particularly troubling because the evidence against Mr. Schaffer of the uncharged
crimes was more compelling, graphic, and disturbing than the evidence of the charged
crimes. The jury saw lengthy videos of Mr. Schaffer having oral sex with an 8 or 9
year old girl and sitting on a bed with a naked 12 or 13 year old girl, whose youth was
highlighted by the presence of her Dora the Explorer backpack. They saw no video
depicting Mr. Schaffer having sex with the complainant. The prejudicial effect from
these explicit videos could scarcely have been greater.

In contrast, the probative value of these unrelated sexual assaults was minimal.
The court believed they were probative because they showed Mr. Schaffer's "sexual
interest in minor females" and a "pattern" of "enticing girls into situations in which
they are alone with him" in swimsuits "before forcing them to engage in sexual

43

conduct." A. 97-98. The court, however, overstated the relevance of these factors. First, the significant age differences between the girls in the videos and the complainant diminished the probative value from showing Mr. Schaffer's alleged interest in minor females. The unrelated videos showed an alleged interest in children, while the complainant here was one month shy of 16, the age of consent in New Jersey. Second, any minimal probative value from the fact that the girls in the other videos were depicted in swimsuits, or changing into swimsuits, was diminished by the fact that the prosecution already had video of the complainant trying on swimsuits. That Mr. Schaffer had the complainant try on swimsuits was not a matter in dispute and the videos were unnecessary to corroborate her testimony.

Additionally, the probative value from these graphic videos was diminished because the defense did not argue that the complainant had consented to the acts she described. Instead, the defense was that the government had not met its burden of proof with respect to the element of Mr. Schaffer's intent in emailing with the complainant and asking her to travel to New Jersey. There was no evidence that the prior sexual assault cases involved any type of enticement to travel across state lines to engage in sexual activity, so they added little to the proof of the disputed element.

The jury was instructed to use the videos for any purpose, including general proof of guilt. No reasonable jury could have failed to use this evidence to convict Mr. Schaffer regardless of any holes in the prosecution's case. In this context, the

court's conclusion that they were not more prejudicial than probative was an abuse of discretion.

D.    These errors were not harmless.

Through the videos, a large portion of Mr. Schaffer's trial devolved into an attack on his sleazy character and general propensity to commit sexual assault. The videos played for about an hour and a half – a huge amount of time in the context of a brief trial (which was transcribed in under 400 pages). And the prosecution highlighted them in its arguments, asking the jury to convict based on Mr. Schaffer's past conduct, and telling them that because of Mr. Schaffer's "manipulation of the other girls" there was "no reason to believe that he intended to do anything different" with the complainant. A. 209. In this context, the court's erroneous introduction of these videos cannot possibly be harmless beyond a reasonable doubt and it is "highly probable" that this error contributed to the verdict. *Chapman*, 386 U.S. at 24; *United States v. Kaiser*, 609 F.3d 556, 574 (2d Cir. 2010) (evidentiary error harmless "if it is 'highly probable' that it did not contribute to the verdict").

Without these videos, the jury may well have seriously considered the defense argument that the government had not proved that Mr. Schaffer intended to sexually assault the complainant when he emailed her. There was nothing sexual about the emails between Mr. Schaffer and the complainant before they met. The defense showed that Mr. Schaffer was starting an apparel business, that he had applied for a wholesale business license, registered his business with the New Jersey tax authority,

45

and ordered bulk apparel. This evidence supported the defense that Mr. Schaffer's intentions in having the complainant come to his office could have been related to this business enterprise rather than any plan to engage in illegal activity.

It is also probable that, because of the graphic videos of unrelated sexual assaults, that the jury did not look closely at the flaws in the prosecution's evidence or consider the aspects of the complainant's story that supported the defense argument that Mr. Schaffer had not lured the complainant to his office for illegal sexual activity. For example, the complainant claimed that Mr. Schaffer discussed sex with her the first day she met him, which implied that his intentions were always sexual. But she also testified that, when she left his office, she was excited at having a new job, and not concerned her employer had asked her questions about her sexual history. This suggested that she was mistaken that sex was discussed that first day. She also testified that she continued to email paramountpics about a job even after she claimed to have been coerced into having sex with Mr. Schaffer, which did not make sense.

After seeing the videos of the other girls, however, it would have been exceedingly difficult for any jury to consider Mr. Schaffer's defense. Because of the magnitude of the prejudice from these videos, the error in introducing them was not cured by the court's instruction that Mr. Schaffer was "not on trial" for conduct "not charged in the indictment." A. 210. Any ameliorative effect from this instruction was undercut because the jury was also told that they could consider his "commission of

46

another offense or offenses of illegal sexual acts" "for its bearing" on whether he "committed the offenses" charged. A. 210. Additionally, because the court refused counsel's request to tell the jury that Mr. Schaffer was facing pending charges in other jurisdictions relating to these videos, the jury was left to wonder whether Mr. Schaffer faced punishment for those incidents or whether it was necessary to punish him for them in the current case. The erroneously introduced videos essentially ensured his conviction.

This Court should, therefore, reverse Mr. Schaffer's conviction and order a new trial.

## Conclusion

For the reasons set forth above, the Court should reverse appellant's conviction, suppress his statements, and order a new trial.

47

**Certificate of Service**

I certify that a copy of this Appendix has been served by CM/ECF on the

United States Attorney/E.D.N.Y.; Attention: **PETER BALDWIN, ESQ.**, Assistant

United States Attorney, 271 Cadman Plaza East, Brooklyn, New York 11201.

Dated: New York, New York
      January 15, 2016

                           /s/_____
                          **Allegra Glashausser**

---

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

    1.  This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because:

        this brief contains 11,646 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

    2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type style requirements of Fed. R. App. P. 32(a)(6) because:

        this brief has been prepared in a monospaced typeface using **MICROSOFT WORD** with **14 characters per inch in Garamond** type style.

Attorney for Appellant **JOHN SCHAFFER**

Dated: New York, New York
      January 14, 2016

                           _____/s/_____
                          **Allegra Glashausser**

48